Filed 2/18/15  P. v. Lopez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FELIX XAVIER LOPEZ et al.,<br><br>    Defendants and Appellants. | B251815<br><br>(Los Angeles County<br>Super. Ct. No. BA379433) |

        APPEALS from judgments of the Superior Court of Los Angeles County.  Gail R. Feuer, Judge.  Affirmed as modified.


        Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Felix Xavier Lopez.


        Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant Jimmy Jacob Padilla.


        Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants (collectively, defendants) Jimmy Jacob Padilla (Padilla) and Felix Xavier Lopez (Lopez) appeal from their convictions of first degree murder. Lopez contends that his conviction was unsupported by substantial evidence, that the trial court should have instructed sua sponte regarding involuntary manslaughter as a lesser included offense of murder, that instructing the jury with CALCRIM Nos. 400 and 401 was error, and that any failure of defense counsel to preserve instructional challenges amounted to a violation of his constitutional right to effective assistance of counsel. Lopez also contends that admitting a hearsay statement violated his constitutional right to confrontation, and that the trial court's sanctions for discovery violations were inadequate. Padilla contends that the trial court erred in precluding him from testifying about the details of the abuse he had suffered as a child, and that two firearm enhancements were stayed under the incorrect authority. Padilla also joins in any of Lopez's contentions that might benefit him. Both defendants contend that the trial court erred in imposing and staying a gang enhancement.

We agree that the gang enhancement must be stricken from both judgments and that Padilla's judgment must be modified to reflect that the firearm enhancements are stayed under the correct authority. We thus modify the judgments, but finding no merit to defendants' remaining contentions, we affirm the judgments as modified.

## BACKGROUND

**Procedural history**

Defendants were charged with the murder of Jonathan Romero (Romero), in violation of Penal Code section 187, subdivision (a).[1] The information alleged pursuant to section 186.22, subdivision (b)(1)(C), that the crime was committed for the benefit of, at the direction of, and in association with a criminal street gang. The information further alleged that a principal personally and intentionally used and discharged a firearm that caused great bodily injury and death, within the meaning of section 12022.53, subdivisions (b), (c), (d), and (e)(1). Defendants were jointly tried, and a jury found them

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

guilty as charged, found the murder to be in the first degree, and found true the gang and firearm allegations.

Lopez was sentenced on October 2, 2013, and Padilla was sentenced on October 15, 2013. The trial court sentenced each defendant to a total term of 50 years to life in prison, comprised of 25 years to life for the murder, plus 25 years to life for the firearm allegation found true under section 12022.53, subdivision (d). The gang enhancement was imposed as to each defendant and stayed pursuant to section 654, and the remaining firearm enhancements were imposed as to Padilla and also stayed pursuant to section 654. The court imposed mandatory fines and fees, ordered $7,500 in victim restitution, and calculated presentence custody credits at 1,015 actual days for Lopez and 1,028 actual days for Padilla.

Defendants filed timely notices of appeal.

**Prosecution evidence**

After visiting a friend on the afternoon of December 23, 2010, Romero went to a nearby bus stop on his way home. The bus stop was located next to a church school and parking lot near Cesar Chavez Boulevard and Bridge Street in the County of Los Angeles. While waiting for the bus, Romero was shot and killed. Alejandra Nunez (Nunez), Romero's girlfriend and the mother of his child, testified that Romero was not a gang member and she never knew him to be affiliated with a gang.

Siamak Simany (Simany) testified that on that day he parked in front of a nearby market and saw Romero waiting at the bus stop across the street. Simany saw nothing unusual about Romero, who was simply standing with one foot up on a bench or wall. Simany went into the market and when he came out a short time later he saw a man walking from the direction of a white van toward Romero with a gun held in one hand at his side. Simany later identified Padilla as the gunman. Simany first saw Padilla walking about four feet away from the van. When Padilla came within seven or eight feet of Romero, he took the gun into both hands and as he continued to move forward, he fired one shot after another at Romero. Neither Padilla nor Romero said anything. Romero raised his hands in a defensive position and looked shocked, but did not move from his

3

position. Simany thought he heard six or seven shots altogether and he saw the shooter continue to pull the trigger after the last shot was fired. Another witness, Raquel Zamora (Zamora) testified that she heard the gunshots, looked out her window, and saw the white van parked on Cesar Chavez Boulevard and Bridge Street.

During the shooting the white van remained where Simany and Zamora first saw it, but when the shooting stopped, it began moving slowly west on Cesar Chavez Boulevard. By that time Los Angeles Police Department (LAPD) Officers Ramon Arguelles and Jae Sung had arrived on the scene in their patrol car. The driver of the van looked in the officers' direction with a surprised look and then started to move forward slowly, looking alternatively at the officers and at Padilla, who was then running after the van. At trial Officer Arguelles identified the driver as Lopez. As the officers, Simany, and Zamora watched, Padilla tried unsuccessfully to open the door of the van as it accelerated. Lopez then turned right and sped off, while Simany and the officers followed Padilla, who fled on foot into the nearby parking lot where he threw his gun up onto a roof. The officers took Padilla into custody.

In the meantime, other officers quickly located the van. LAPD Officer Greg Trejo and his partner Officer Finnegan saw the van parked on a street near the freeway, and Lopez running down an embankment next to a freeway. They gave chase, followed by two other officers as Lopez ran through traffic across the transition lanes of the freeway and then across the freeway to the opposite shoulder, where he was taken into custody.

The medical examiner determined that Romero had been shot 11 times from a distance of more than two feet. One fatal bullet passed through both lungs, his windpipe, and esophagus, and another passed through both lungs and his heart.

Of the fingerprints later lifted from the van, none matched defendants', but prints found on the inside of the driver's window matched those of Lopez's brother, Gilbert Lopez (Gilbert).

The bullets taken from Romero's body and casings found at the scene of the shooting were determined to have been fired from the nine-millimeter handgun recovered from the roof. The ammunition capacity of the gun was 11 rounds: 10 in the magazine

4

and one in the chamber.  DNA was recovered from the magazine and compared to samples taken from defendants and Romero.  DNA analyst Guy Holloman testified that the DNA of at least two people was found on the magazine.  Romero was excluded as a contributor to the DNA taken from the magazine, but neither Lopez nor Padilla could be excluded as possible contributors.  Holloman explained that one in 14,000 persons would be a possible match to the DNA profile containing similarities to Padilla's DNA profile, and that just one in two million persons would have been a possible match to the profile containing similarities to Lopez's profile.  Holloman agreed that a secondary transference of DNA was possible, and that sibling DNA would be similar.  However, if Gilbert's DNA had been compared and found to be on the magazine, this would not change the probability that Lopez was a contributor to the DNA mixture.

Lead investigator Detective Douglas Kirkland listened to defendants' recorded jailhouse telephone and visitation conversations and identified the voices on the excerpts of the recordings played for the jury.  In January 2011, Lopez spoke to both Leslie Martinez (Martinez), who was the mother of his child, and her mother.  When Martinez's mother mentioned Padilla's first name (Jimmy) and his nickname (Chucko), Lopez said that he did not know that guy or what she was talking about, and then told Martinez to tell her mother to "shut up."  In one conversation, Lopez asked Martinez to deposit money in both his jail account and that of an another inmate, whom he did not name.  Thereafter Martinez deposited $50 into both Lopez and Padilla's accounts.

**Gang evidence**

LAPD Officer Sergio Salas testified as the prosecution's gang expert.  Officer Salas's expertise included the history of both the Cuatro Flats and the Primera Flats gangs, and the culture of criminal street gangs in general.  His experience included patrolling gang neighborhoods and investigating gangs as a gang officer.  His primary function as a gang officer was to gather intelligence on the gang assigned to him, and in the course of his assignment, he would come into contact with gang members on a daily basis, at times during investigations, or during pedestrian or traffic stops or consensual encounters.

Officer Salas testified that the Cuatro Flats gang and the Primera Flats gang were allies in the past, but by early 2005, when Salas joined the gang unit, the alliance had failed and they became rivals. The rivalry between the two gangs was heated, and by 2010, it was an active gang war, which meant that members of the respective gangs would confront, assault or even murder one another whenever they met. At the time of this crime, there were shootings, crossed-out graffiti and other demonstrations of the rivalry. The shooting of Romero took place in the territory of the Primera Flats gang. Officer Salas testified that any member of the Cuatro Flats gang who wanted to go elsewhere, such as to the Homeboy Industries office, would not be likely to travel through Primera Flats territory, but would take a safer, alternate route.

Officer Salas explained that gangs usually used graffiti to communicate what territory they claimed and controlled. Rivalries between gangs became apparent when graffiti was crossed out or disrespectful names were written over it. For example, Cuatro Flats gang members were disrespectfully called "Cornflakes" which was derived from the C and the F in Cuatro Flats. Primera Flats gang members were disrespected by the name "Papas Fritas" (meaning French fries), or "Papas."

Officer Salas testified that territory was very important to gangs. It was essential to maintain control over a territory in order to have a safe zone from rivals, to control the narcotic sales in the territory, and to conduct criminal activity without fear of being reported. Officer Salas also explained the gang concept of respect, which was also very important to gang members and meant something closer to fear. Individual members earned the respect of their gang by going on "missions," which were usually crimes committed against a rival gang, members of the community, or the police. The greater the importance of the mission the greater the respect, prestige, and authority the individual could earn within the gang. Acts of violence, particularly going into rival gang territory to shoot a rival, could garner greater status. Respect for the gang in the community made witnesses unwilling to come forward.

"Putting in work" was another term commonly used by gang members. It meant to commit crimes or other acts to benefit the gang, further its cause, or to promote it. The

6

work could be anything from theft to murder, and the more work a gang member put in, the more status, respect, and recognition was earned within the gang. Work was conduct that benefitted the gang, and it was usually criminal conduct. Officer Salas explained that not all crimes committed by gang members were gang crimes; for example, a gang member would not be considered putting in work if he stole diapers for his child. On the other hand, stealing a gun for the gang would benefit the gang and thus be gang-related. The primary activities of the Cuatro Flats gang included felony vandalism, armed assaults, illegal weapons possession, robbery, carjacking, narcotic sales, murder, and attempted murder.

There were different levels of gang membership. Officer Salas described a "shot caller" as a "veterano," usually a hard-core and violent member who orchestrated the activities of the gang, taught the younger members how the gang operated. These older, more knowledgeable members had earned a lot of respect, and while they might continue to commit crimes themselves, they might also just give orders.

It was common for gang members to commit crimes together for reasons such as providing mutual protection, having a lookout, teaching other gang members how a mission is done, making a show of force to create fear, and validating one another's courage, commitment, and allegiance to the gang. In drive-by shootings, there might be several people in the car in addition to the driver, and sometimes there would be more than one lookout. Often the mission involved only the driver and the shooter, and the driver would act as a lookout. A gang member would not go on a mission with someone he did not trust to keep his mouth shut, and anyone who "snitched" on another gang member could be killed.

Officer Salas knew Padilla, known by the moniker "Chuco." During the five years that Officer Salas had been assigned to investigate the Cuatro Flats gang, he had more than 40 contacts with Padilla in the gang's territory. Padilla had admitted to Officer Salas that he was a member of Cuatro Flats. In Officer Salas's opinion Padilla was a member of the Cuatro Flats gang and the Bagos clique within the Cuatro Flats gang. Officer Salas had observed some of Padilla's tattoos, including "C-F" for Cuatro Flats on his neck and

7

chest. Officer Salas also identified a photograph of Padilla's other gang-related tattoos, including "Flats" on his abdomen and "BGS" for Bagos on his neck.

In addition, Officer Salas was of the opinion that Lopez was also a member of the Cuatro Flats gang. Although the officer had had no personal contact with Lopez, he remembered having seen a photograph in 2009 or 2010, in which Lopez was posing with other gang members in a way that indicated he was also a member of the gang. Officer Salas knew Lopez's brother Gilbert, who had previously admitted his membership in Cuatro Flats to the officer. Although the brothers resembled each other, Officer Salas knew it was not Gilbert in the photograph because Gilbert was 10 years older than Lopez, taller, and fuller in the face, and Lopez had "Lopez" tattooed on his abdomen, whereas Gilbert had a different tattoo on his abdomen. Officer Salas compared that photograph with recent photographs of Lopez and confirmed that the photograph with other gang members depicted Lopez. The officer failed to preserve the group photograph, but at trial, he identified photographs of Lopez's gang-related tattoos, including the word "Flats," a large number "4," the letters "C" and "F," and the word "Four."

Officer Salas found no evidence that Romero was associated with any criminal street gang. When Officer Salas was shown the photograph which Nunez had identified as depicting Romero wearing clothing similar to what was worn on the day of the shooting, he testified that Romero's shaved head and elements of his clothing, such as oversized jeans and shirt, might indicate gang membership, but it was not only gang members who wore such styles.

Presented with a hypothetical question mirroring the facts in evidence, Officer Salas noted elements of the crime that were common to gang shootings, such as gang members working together, one as a lookout and getaway driver and the other as the shooter. In his opinion, based on his background, training, and experience, the hypothetical crime was committed for the benefit of, at the direction of, or in association with the participants' gang. Association with a criminal street gang was demonstrated by two gang members going on a mission together into rival gang territory and choosing a victim who looked like he could be a gang member. Officer Salas explained how the

8

commission of a violent crime such as murder in broad daylight would benefit the gang. Word of it would travel throughout the community, and thus create an atmosphere of fear and intimidation in the community and within the rival gang, causing residents to be afraid to report the gang's crimes, and establishing its dominance over rival gangs. The status of the perpetrators within their gang would also be elevated, thus benefitting both gang and gang members.

**Defense evidence**

Forensic scientist Marc Scott Taylor, whose company had analyzed more than 300,000 DNA samples in its laboratory, explained secondary DNA transfer, which might occur when DNA is transferred from one person by touching another person, who then transfers it to another person or object.

Padilla testified that on the day of the shooting, he unexpectedly met Lopez at a restaurant when Lopez entered with Martinez. He greeted Lopez with a handshake and a hug. Padilla admitted he had been a member of the Cuatro Flats gang for five years before the shooting, that his clique was Bagos, and that he was called "Chucko." Padilla claimed that although Lopez was a member of the Cuatro Flats gang and he belonged to the same clique, Padilla rarely saw him. They had met through friends "Raccoon" and "Cricket" who were active Cuatro Flats gang members. Padilla also knew Martinez, having met her before he knew Lopez.

Padilla claimed he asked Lopez for a ride to his house, but Lopez said he could not take him that way because he had a job interview at Homeboy Industries. Padilla suggested a bus stop at Cesar Chavez Boulevard and Pennsylvania Avenue, although he knew that it was Primera Flats territory and that members of the Primera Flats gang were the enemies of the Cuatro Flats gang. To get to the restaurant from home, Padilla had taken a different bus with a closer stop to the restaurant, but he claimed to have suggested the stop in Primera Flats territory because he was tired and wanted to take an express bus home, and because he was familiar with the neighborhood from the time his mother had lived there. On the way, Lopez dropped off Martinez.

9

There was a stranger (Romero) at the bus stop when they arrived, but Padilla claimed to have perceived no threat because Romero was small and did not look like a gang member. Padilla was armed for "protection from his enemies" -- members of the Primera Flats gang -- because they had previously shot at him and threatened him. Padilla claimed the gun was in his waistband, not visible under his shirt, and that his hands were in his side pockets when Romero "dissed" Padilla's "hood" by saying, "Cornflake, Cornflake." Padilla explained that Cornflake was a derogatory term for Cuatro Flats, and in Padilla's thinking, such an insult communicated an intent to hurt or kill him. Padilla claimed he then saw Romero's hand near his waist and thought Romero intended to kill him, so he pulled out his own gun and fired. Frightened, Padilla ran away, saw Lopez at the corner, and tried to get back into the van, but Lopez drove away. When Padilla saw the police he ran because he was scared.

Padilla admitted he told the detectives a "wildly different" version of the events, explaining that he lied that night because he was scared. He told the detectives that he did not know the person in the white van, that he had walked to the bus stop, and that Romero crossed the street toward him from the liquor store on the corner, went behind him, and must have seen the tattoo on his neck which indicated his gang affiliation. He also told detectives that Romero punched him and said "Primera Flats," that the gun belonged to Romero, and that Padilla wrested the gun from Romero before firing. He told them that he could not recall how many times he shot Romero. Padilla did not tell the detectives that Romero called him Cornflake, or that Padilla saw him before getting out of the van.

Padilla did not mention Lopez to the detectives, and he claimed at trial that Lopez had nothing to do with the crime. Padilla explained that "mission" was a gang term which meant going to rival territory, sometimes to kill a rival or enemy, but not always. He denied that he was on a mission that day. Padilla also claimed that Lopez was not actively involved in the Cuatro Flats gang, that Padilla had not seen him for five to seven months before the shooting, and that as far as Padilla knew, Lopez did not know Padilla was armed or that he was going to shoot someone that day. Padilla admitted that no one

10

except his own family members and Martinez deposited money for him while he was in jail.

Padilla testified he had been taken from the custody of his mother and father at the age of two, placed in foster care, and returned to their custody at the age of 13.  He was physically abused in foster care, and when returned to his parents, his father physically abused him and his mother sexually abused him.  Padilla was interviewed by a psychiatrist prior to trial, but did not disclose the childhood abuse; nor did he advise the detectives investigating the case.

Neuropsychologist Kevin Booker, who interviewed Padilla for the defense in May 2013, diagnosed Padilla with post traumatic stress disorder (PTSD).  Padilla told Dr. Booker that there were things in his childhood he did not want to talk about, and he did not mention child abuse.  He told Dr. Booker about other multiple traumatic events he had experienced over the course of his life, including having witnessed the shooting death of a friend.  These events left him with the three symptom clusters characteristic of PTSD:  re-experiencing, which usually meant having nightmares or daytime intrusive thoughts or recollections; avoidance symptoms such as avoiding people, places, things, or reminders of the traumatic event; and hypervigilance, manifested by a preoccupation with personal or physical safety, exaggerated responses, and sometimes overly aggressive responses to perceived life threats.  Dr. Booker explained that a person like Padilla with PTSD would avoid gang warfare situations and dangerous areas.

## DISCUSSION

### I.  Substantial evidence of Lopez's complicity as an aider/abettor

Lopez contends that his conviction of first degree murder was not supported by substantial evidence.  In particular, he argues that the evidence failed to adequately show that he was an active gang member who acted with the intent or purpose of facilitating a premeditated murder.

#### A.  *Standard of review*

When a criminal conviction is challenged as lacking evidentiary support, we "review the whole record in the light most favorable to the judgment below to determine

11

whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid.*) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### B.  *Legal principles relating to aiding and abetting first degree murder*

"All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (§ 31.) Conviction as an aider and abettor requires proof that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. [Citations.]" (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) Thus, to be guilty of first degree murder, the aider and abettor must share the perpetrator's premeditated intent to kill. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; see *People v. Chiu* (2014) 59 Cal.4th 155, 159-160 [the natural and probable consequences doctrine does not apply to first degree murder].)

"All murder which is perpetrated by means of . . . willful, deliberate, and premeditated killing  . . . is murder of the first degree." (§ 189.) Premeditation and deliberation means "preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse. [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) "Whether one has aided and abetted in the commission of a crime is a question of fact for the jury to determine from the totality of the circumstances proved. [Citation.] Factors which the jurors may consider in making such determination include presence at

the crime, companionship and the conduct of the accused before and after the offense. [Citation.]"  (*People v. Perryman* (1967) 250 Cal.App.2d 813, 820.)  The aider and abettor's knowledge of the criminal purpose of the perpetrator must necessarily exist at the time he acts to facilitate or encourage the commission of the crime.  (*People v. Williams* (1997) 16 Cal.4th 635, 676.)  Once the evidence demonstrates knowledge of the perpetrator's intent to kill, the aider and abettor's premeditation may be reasonably inferred, as "[i]t would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required.  [Citation.]"  (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1166.)

### C.  Substantial evidence supports the verdict

Rather than considering the totality of the circumstances or summarizing all the evidence in the light most favorable to the judgment, Lopez cites several isolated circumstances to demonstrate his contention that the evidence was insufficient to establish a shared intent to kill.  For example, he argues that there was no *direct* evidence of his knowledge of Padilla's intent to kill or a plan or agreement to kill Romero. However, circumstantial evidence is sufficient to prove a defendant's state of mind. (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

Lopez also contends that the gang expert's testimony should be discounted as "generic" because it was not supported by evidence that the victim was a gang member or that defendants yelled out any gang challenges.  However, Lopez cites no authority for rejecting expert testimony on that basis, and we have found none.  Lopez also faults the gang expert's testimony regarding gang missions and the roles of driver, lookout, and shooter, and contends that it was insufficient to establish motive or intent, in part because the prosecution failed to show that he was an *active* gang member.  Again Lopez fails to cite authority that would require the reviewing court to reject gang evidence on that basis. Although Lopez's DNA on the magazine of the murder weapon suggests that he knowingly handled it, Lopez draws the conflicting inference that his DNA might have been transferred to Padilla when they touched, and then transferred by Padilla to the

13

magazine. Finally, Lopez argues that driving away before Padilla could enter the van was inconsistent with the role of getaway driver.

Our task is to determine from all the facts and circumstances presented whether a jury could reasonably have concluded that Lopez was aware of Padilla's intent to kill Romero and shared that intent; it is not to determine whether there were circumstances that might reasonably support a contrary finding, as Lopez's arguments suggest. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1194.) Under the appropriate standard, we have reviewed of all the evidence, direct *and* circumstantial, and we have presumed the existence of every fact the jury could reasonably have inferred from the evidence, without reweighing the evidence or resolving conflicts. (See, e.g., *People v. Kraft, supra*, 23 Cal.4th at p. 1053; *People v. Young, supra*, 34 Cal.4th at p. 1181.)

We agree with respondent that under the correct standard, compelling evidence supports a finding that Padilla intended to kill Romero, that Lopez knew of that intent and shared it, and that he aided and abetted the murder. Both defendants were members of the same clique of the Cuatro Flats gang, which was in a heated gang war with the Primera Flats gang. Members of the two gangs assaulted one another when they met, and gang members were known to go on missions to assault or kill rival gang members. Usually more than one gang member would go on such missions: one to commit the assault; one or more lookouts; and a getaway driver who might double as a lookout. On December 23, 2010, Lopez drove Padilla into Primera Flats gang territory. Lopez parked the van near a man whose clothing and hair style made him appear to be a gang member, and then waited in the van, ready to drive away as Padilla got out of the van, gun in hand, and walked toward the man. Lopez waited as Padilla held the gun in both hands and fired 11 bullets in quick succession into the unarmed and unresisting victim. Lopez continued to wait as Padilla ran back to the van. It was only after being surprised by the arrival of the police that he fled. Lopez then abandoned the van nearby and ran across freeway lanes in an attempt to evade capture. Forensic testing of the murder weapon's magazine established that Lopez's DNA profile could not be excluded from the DNA mixture found on it, with the probability of just one in two million of a random match to the same

14

genetic markers. Finally, far from showing resentment toward Padilla for having caused his arrest, Lopez instructed his girlfriend to place money into Padilla's jail account while they were awaiting trial.

In sum, factors such as Lopez's gang membership, his presence at the scene in rival gang territory, a connection to his DNA on the gun magazine, his companionship with Padilla and his conduct before, during, and after the shooting all provide ample evidence that Lopez aided and abetted the crime knowing Padilla's intentions.

## II. Involuntary manslaughter

Lopez contends that the trial court erred by failing to instruct the jury sua sponte regarding involuntary manslaughter as a lesser included offense of murder. He argues that the evidence was such that a reasonable jury could conclude that he intended to aid and abet a simple assault or misdemeanor exhibition of a firearm, and he cites the principle that where a lesser offense, but not the greater, is a reasonably foreseeable consequence of the crime originally aided and abetted, the trial court must instruct the jury that it may find a defendant guilty of the lesser offense, even if it determined the perpetrator was guilty of the greater. (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1585-1588.)

Involuntary manslaughter is an unlawful killing "in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192.) "Generally, involuntary manslaughter is a lesser offense included within the offense of murder. [Citation.] Due process requires that the jury be instructed on a lesser included offense *only* when the evidence warrants such an instruction. [Citations.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.)

When the evidence demonstrates that a defendant committed a deliberate criminal act, not simply a criminally negligent act, and under all the circumstances murder was reasonably foreseeable, the trial court has no sua sponte obligation to give an involuntary manslaughter instruction. (*People v. Huynh* (2002) 99 Cal.App.4th 662, 679.) Whether murder was reasonably foreseeable must be determined by considering all the

15

circumstances. (*People v. Medina* (2009) 46 Cal.4th 913, 920.) Reasonable foreseeability is determined under an objective standard. (*People v. Chiu, supra*, 59 Cal.4th at p. 161.)

We agree with respondent that there was no substantial evidence that Lopez intended to aid and abet a misdemeanor assault or firearm exhibition. Assuming there was such evidence, a consideration of all the circumstances fails to establish that murder was not a reasonably foreseeable consequence of those crimes. Lopez was a member of the Cuatro Flats gang, a criminal street gang whose primary activities included armed assaults, murder, and attempted murder. Lopez's gang was in an active gang war against the Primera Flats gang, which meant that members of the two gangs would confront, assault or even murder one another whenever they met. Lopez drove into Primera Flats territory with another member of his gang under circumstances suggesting they were on a mission to assault a rival gang member. The probability was high that Lopez was one of the contributors of DNA on the magazine of the murder weapon, suggesting that he had handled the gun and thus knew that Padilla intended to use it while in Primera Flats territory. A shooting death is often a reasonably foreseeable consequence of a gang confrontation. (See *People v. Medina, supra*, 46 Cal.4th at pp. 925-926.)

Even assuming that Lopez intended a misdemeanor assault or exhibition of a firearm in rival gang territory, the greater offense of murder was not unforeseeable, and the trial court was under no obligation to give an instruction on involuntary manslaughter. (See *People v. Memro* (1995) 11 Cal.4th 786, 871; *People v. Woods, supra*, 8 Cal.App.4th at pp. 1585-1588, 1593.)

Moreover, if the trial court had erred, any such error would be harmless beyond a reasonable doubt. The jury was instructed with regard to both first and second degree murder and found Lopez guilty of first degree murder, thus concluding that he aided and abetted the shooting knowing that Padilla intended to kill, which necessarily precluded a finding that Lopez could not reasonably foresee the killing. Thus, "'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant

16

under other, properly given instructions' [citation]." (*People v. Prettyman* (1996) 14 Cal.4th 248, 276.)[2]

## III.  CALCRIM Nos. 400 and 401

Lopez contends that the trial court erred in instructing the jury with regard to direct aiding and abetting with CALCRIM Nos. 400 and 401, because the two instructions failed to state that an accomplice can be found guilty of a lesser crime than the perpetrator, thus allowing the jury to find him guilty of first degree murder without finding that he intended to aid and abet a first degree murder.[3]  Lopez acknowledges that he did not object to the instructions, but contends that we should review the issue as the error affected his substantial rights.  (See *People v. Famalaro* (2011) 52 Cal.4th 1, 35; § 1259.)  We have reviewed the instructions, considered Lopez's arguments, and conclude that the contention lacks merit.

Lopez relies on *McCoy, supra*, 25 Cal.4th at page 1118, in which our Supreme Court held that in murder cases not based on the natural and probable consequences

---

[2]     Lopez suggests that the jury may have been confused by the instructions because they referred to "the defendant" without distinguishing between the actual perpetrator and the accomplice.  However, he points to no evidence of confusion, and there was no need to make such a distinction, as the trial court instructed the jury that all instructions applied to each defendant unless the court instructed otherwise.

[3]     The trial court instructed the jury with the 2010 revised CALCRIM No. 400 as follows:  "A person may be guilty of a crime in two ways:  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator who directly committed the crime.  A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator."  The relevant portion of CALCRIM No. 401 was as follows:  "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that, one, the perpetrator committed the crime; two, the defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime.  Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to and does, in fact, aid, facilitate, promote[,] encourage, or instigate the perpetrator' s commission of that crime."

17

doctrine, the aider and abettor may be found guilty of a lesser offense if he did not know or share the murderous intent of the actual perpetrator.

Lopez also relies on cases in which former CALCRIM No. 400 was found to be misleading in some circumstances because it instructed that an aider and abettor was "equally guilty" as the perpetrator, which might lead a jury to conclude that any aider and abettor is necessarily guilty of the same offense as the perpetrator regardless of the aider and abettor's particular state of mind. (See, e.g., *People v. Nero* (2010) 181 Cal.App.4th 504, 518; *People v. Samaniego, supra*, 172 Cal.App.4th at p. 1163.) Although the "equally guilty" language caused CALCRIM No. 400 to be misleading and incomplete in some cases, it correctly stated the law. (*People v. Loza* (2012) 207 Cal.App.4th 332, 349-350; *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119 & fn. 5; see *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433-434 [former CALJIC No. 3.00].) As the jury in this case was given revised instructions without the "equally guilty" language, the instructions were not misleading as to the aider and abettor's state of mind.

Lopez contends however, that the elimination of "equally guilty" did not cure the defect because CALCRIM No. 400 was read together with CALCRIM Nos. 520 (defining murder) and 521 (defining first degree murder and explaining premeditation and deliberation). He argues that the instructions "essentially informed" the jury that it could find him guilty of first degree murder as an aider and abettor based upon the perpetrator's premeditated intent to kill, rather than the aider and abettor's own intent. Lopez's reasoning is unclear, but as we construe the argument, the instructions created confusion by referring generally to "the crime" and "the defendant," and by failing to explain the particular crime, degrees, and required mens rea *within* CALCRIM No. 400 or No. 520, and that instructing the jury that all instructions applied to each defendant unless the court instructed otherwise merely compounded any confusion.

We reject Lopez's narrow reading of isolated portions of the instructions. We must review the adequacy of the instructions in light of the entire charge to the jury. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) CALCRIM No. 401 clearly explained the aider and abettor's required mental state, and CALCRIM Nos. 520 and 521

18

explained the elements of first and second degree murder and the required mental states for those crimes. The explanation that all instructions applied to each defendant was just one sentence of CALCRIM No. 203, which the trial court read as follows: "The defendants, Jimmy Padilla and Felix Lopez, are charged with the same crimes. You must separately consider the evidence as it applies to each defendant. You must decide each charge for each defendant separately. If you cannot reach a verdict on both of the defendants or on any of the charges against any defendant, you must report your disagreement to the court, and you must return your verdict on any defendant or charge on which you have unanimously agreed. Unless I tell you otherwise, all instructions apply to each defendant." Considered together, the instructions adequately informed the jury that to find Lopez guilty of first degree murder, it must find that he personally harbored the mental states of premeditation and deliberation. "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. [Citation.]" (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

In her summation, the prosecutor discussed the mental states of each defendant separately without suggesting that the jury could not convict Lopez of a lesser crime than the actual shooter. During deliberations, the jury asked whether it had the option of convicting Lopez of either first or second degree murder and the trial court instructed that it did have that option. Thus, the jury seemed to know that it was required to consider each defendant's mental state separately and that if it found Padilla guilty of first degree murder, it was not required to find Lopez "equally guilty" of first degree murder. We conclude there was no error and no reasonable likelihood the jury was misled or that it construed the instructions as relieving it of the requirement of determining Lopez's individual mental state. As the instructions given were correct in the law on this issue and responsive to the evidence, the trial court had no duty to give additional clarifying or amplifying instructions absent a request. (*People v. Mayfield* (1997) 14 Cal.4th 668, 778.) Thus, Lopez should have requested any clarification, different language, or additional, pinpoint instructions he deemed necessary. (See *People v. Samaniego, supra*, 172 Cal.App.4th at p. 1163.)

19

In any event, the absence of clarification or alternate language was harmless under any standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).) The trial court's response to the jury's note informed the jury that an aider and abettor may be found guilty of a lesser degree of murder than the actual perpetrator. In addition, the evidence of Padilla's premeditated intent to kill Romero was overwhelming, and we agree with respondent that there was no basis to find Lopez guilty of a lesser degree of murder than Padilla. In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27, the California Supreme Court suggested "three types of evidence -- evidence of planning activity, preexisting motive, and manner of killing -- that assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation. [Citation.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) There is no requirement that all three factors be established or that any factor must be shown by direct evidence. (*People v. Perez, supra*, 2 Cal.4th at pp. 1124-1125.) Here, planning may be reasonably inferred from evidence that Padilla armed himself before the shooting. (See, e.g., *People v. Caro* (1988) 46 Cal.3d 1035, 1050; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224.) The possible match to Lopez's DNA on the gun magazine strongly suggests that Lopez knew Padilla was armed. Lopez's motive may be reasonably inferred from the heated rivalry between Lopez's gang and the Primera Flats gang. (See *People v. Sanchez, supra*, 26 Cal.4th at p. 849; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002.) The manner in which Romero was killed, by 11 shots being fired in succession as Romero raised his hands defensively, demonstrated Padilla's premeditated intent to kill; and Lopez's membership in the same gang, his assistance in driving, and his waiting for Padilla all implied his awareness of Padilla's intended actions.

In sum, Lopez's companionship with Padilla and his conduct before, during, and after the shooting, provided compelling evidence that supported the decision that Lopez aided and abetted the crime knowing Padilla's intentions. Knowing of the perpetrator's intent to murder and deciding to aid in accomplishing the crime necessarily requires a brief period of deliberation and premeditation. (See *People v. Samaniego, supra*, 172

20

Cal.App.4th at p. 1166.) We conclude that it is clear beyond a reasonable doubt that a rational jury would have found Lopez guilty of first degree murder even if the instructions had included express language that an aider and abettor may be found guilty of a lesser degree of murder than the actual perpetrator.

## IV. Scope of expert's testimony

Lopez contends that several rulings with regard to the gang expert's testimony were erroneous and resulted in a violation of his constitutional rights to due process, a fair trial, and confrontation. In particular, Lopez contends that Gilbert's statement to Officer Salas that Lopez was a member of his gang was testimonial hearsay which should have been excluded under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), and *Davis v. Washington* (2006) 547 U.S. 813. Lopez also contends that the tardy disclosure of Gilbert as the declarant and the failure of Officer Salas to preserve Lopez's photograph with other gang members were discovery violations for which the trial court should have imposed all requested sanctions.

### A. Crawford *challenge to Gilbert's statement*

Lopez contends that Gilbert's statement was testimonial hearsay and admitted in violation of his constitutional right to confrontation. Under *Crawford*, the admission of testimonial hearsay violates a defendant's confrontation rights unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Crawford, supra*, 541 U.S. at pp. 68-69.)

In his motion in limine objection to the statement on the ground that it was unreliable hearsay and more prejudicial than probative and thus excludable under Evidence Code section 352, Lopez did not invoke the confrontation clause. Nor did Lopez invoke the confrontation clause later when he objected to Officer Salas's testimony on the sole ground that the prosecution had not informed the defense of Gilbert's statement until just before jury selection. After Lopez objected to Gilbert's statement as unreliable hearsay, the trial court found both the statement and the photograph to be sufficiently reliable and overruled the objections. As Lopez did not raise a constitutional issue in the trial court, his challenge is limited to demonstrating that

21

the rulings made were erroneous and had the additional consequence of violating his federal confrontation rights. (*People v. Loy* (2011) 52 Cal.4th 46, 66.)

We have reviewed Lopez's confrontation claim and find it is without merit, as we do not agree with Lopez's assertion that Gilbert's statement was testimonial. "Only the admission of testimonial hearsay statements violates the confrontation clause." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812.) When a gang officer relies on a nontestimonial statement made during a casual encounter with a gang member, there is no confrontation violation. (*People v. Valadez* (2013) 220 Cal.App.4th 16, 35-36 (*Valadez*).) Like consulting with experienced officers and reviewing written materials about gangs, casual encounters with gang members are the sorts of activities "gang expert witnesses almost surely must do to become qualified as experts." (*Id*. at p. 35.) Such casual conversations do not qualify "under any definition of 'testimonial'" when there is no objective indication that the offer intended to target the defendant or any other individuals or crimes for investigation, or to establish past facts for a later criminal prosecution. (*Id*. at pp. 35-36.)

Here, Officer Salas used his daily contacts with gang members to learn about the gangs in his assigned area rather than conduct any targeted investigation. In argument concerning defendant's motion in limine, the prosecutor represented to the court that the statement was made during a "casual encounter" between Officer Salas and Gilbert. Their conversation was about life generally and included: "What's going on, how have you been" and "Haven't seen you in a while." Gilbert then told the officer that he told his brother Gordo to stop "messing around with the hood," meaning the gang, but he "was caught up."[4]

Lopez did not question the officer regarding the circumstances of the conversation, either at the hearing on the motion in limine or upon objecting to Officer Salas's trial testimony. We are thus left with the prosecution's offer of proof that Gilbert's statement,

---

[4]     The court ruled that Officer Salas could not bring out the details of the conversation, but would be limited to testifying that Gilbert had said his brother was called Gordo and was a member of Cuatro Flats.

22

identifying his brother as a member of his gang, was made during a casual encounter of the kind upon which experts may rely, and was thus not testimonial hearsay. The confrontation clause and *Crawford* are thus not implicated here. (See *Valadez, supra*, 220 Cal.App.4th at pp. 35-36.)

### B. Discovery sanctions

Lopez also contends that the prosecution's failure to preserve the photograph and the failure to identify Gilbert as the declarant until after the preliminary hearing were discovery violations for which the trial court should have imposed all requested sanctions. He contends that the trial court erred in refusing to strike the pertinent testimony and should not have limited argument regarding the prosecution's failure to produce the photograph.

With regard to Gilbert's statement, the trial court found no discovery violation and declined to strike the officer's testimony, but the court agreed to read the prosecutor's statement to the jury that she did not recall having a conversation with Officer Salas prior to the preliminary hearing regarding his contact with Gilbert.

With regard to the photograph, Officer Salas testified that it had apparently been deleted in a routine purge of department emails. In a written decision, the trial court found that the photograph was potentially exculpatory evidence, and that Officer Salas's failure to preserve it was gross negligence amounting to bad faith. The court's initial ruling was to strike the testimony regarding the photograph but not the officer's opinion. Later, the court gave defense counsel two options: the court would either strike the officer's testimony regarding the photograph, in which case defense counsel would not be permitted to bring up in argument the failure to preserve it; or the court would not strike the testimony, give an instruction about the failure to preserve the photograph or to make it available to the defense, and counsel would be permitted to argue the topic. Counsel

23

preferred both remedies, but after the court declined, counsel chose the instruction option.**5**

The loss of material exculpatory evidence may violate a defendant's right to due process. (*Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).) Thus, the prosecution has an affirmative duty to preserve evidence that "might be expected to play a significant role in the suspect's defense." (*California v. Trombetta* (1984) 467 U.S. 479, 488, fn. omitted.) When the evidence is merely potentially exculpatory, due process is not implicated unless the evidence was lost or destroyed in bad faith. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57-58.) In addition, there is no *Brady* violation and due process issues are not implicated when evidence is disclosed at trial, even where statute requires earlier discovery. (*People v. Verdugo* (2010) 50 Cal.4th 263, 281; see § 1054.1 [the reciprocal-discovery statute].)

In either case, "the trial court has discretion to impose appropriate sanctions, including fashioning a suitable cautionary instruction. [Citations.]" (*People v. Medina* (1990) 51 Cal.3d 870, 894.) "[T]he courts enjoy a large measure of discretion in determining the appropriate sanction . . . . 'The remedies to be applied need be only those required to assure the defendant a fair trial.' [Citations.]" (*People v. Zamora* (1980) 28 Cal.3d 88, 99, fn. omitted.) "[A]bsent a showing of significant prejudice and willful conduct, exclusion of testimony is not appropriate as punishment." (*People v. Gonzales* (1994) 22 Cal.App.4th 1744, 1758.) We review the trial court's choice of sanctions for abuse of discretion. (See *People v. Lucas* (2014) 60 Cal.4th 153, 221-222.)

---

**5**     Accordingly, the jury was instructed: "Police officers testifying as witnesses for the prosecution have a duty to preserve and make available to the defense evidence that the witness will rely upon to support any opinions rendered by that witness at trial. Officer Salas, as the prosecution's gang expert, failed to preserve and make available to the defense the purported photograph of defendant Lopez referenced during his testimony. In evaluating the weight and significance of Officer Salas's testimony concerning the basis of his opinion that defendant Lopez is a gang member, you may consider the effect, if any, of Officer Salas's failure to preserve and make available to the defense the referenced photograph."

24

Lopez has made no showing of willful conduct or significant prejudice, which would justify the trial court in striking Officer Salas's testimony or the photograph. The suppression of Gilbert's identity was tardy rather than willful, and the photograph was lost through gross negligence. Lopez reasons that the discovery violations were prejudicial because, although proof of his gang membership was "critical" to the prosecution's ability to establish his intent to kill and premeditation, the photograph and statement were the only evidence supporting the gang expert's opinion that he was an *active* gang member at the time of the crime. First, we observe that Officer Salas merely opined that Lopez was a member of the Cuatro Flats gang, and Lopez has not cited anywhere in the record where Officer Salas gave his opinion that Lopez was an *active* gang member. In addition, Lopez has provided no argument or authority to support the suggestion that *active* gang membership, as opposed to simple gang membership, was critical to the prosecution's case.

Regardless of whether Lopez's participation in his gang's activities could be considered active or inactive at the time of this crime, the evidence that he aided and abetted in Romero's murder and shared Padilla's intent to kill remains compelling, as we have previously discussed. Padilla testified that Lopez was a member of the Cuatro Flats gang, although he claimed Lopez was not active. And the photographs of Lopez's gang-related tattoos left little doubt that he was at the very least affiliated with the Cuatro Flats gang, as they included the word "Flats," a large number "4," the letters "C" and "F," and the word "Four." Lopez drove a fellow gang member into rival Primera Flats gang territory during an ongoing gang war. Lopez parked the van near a man whose clothing and appearance suggested he was a gang member, and then waited in the van while Padilla emptied his gun into that man. Lopez continued to wait until the police arrived. He thereafter abandoned the van nearby, and then risked his life by fleeing from the police through freeway traffic. Lopez's DNA profile was a probable match to the DNA found on the magazine of the murder weapon. Lopez later demonstrated his continuing close association with Padilla by having his girlfriend deposit money into Padilla's jail account.

25

We found that such evidence amply demonstrated that Lopez aided and abetted the crime knowing what Padilla intended to do, and we would find the evidence no less compelling if Lopez's membership in the Cuatro Flats gang was shown to be inactive prior to the commission of this crime. Finding no significant prejudice, we conclude that the sanctions imposed were not an abuse of the trial court's discretion. The same considerations would lead us to conclude that the tardy disclosure of Gilbert's identity and the admission of Officer Salas's testimony regarding the photograph were harmless, as it is clear beyond a reasonable doubt that a rational jury would have found that Lopez was a member of the Cuatro Flats gang, whether active or inactive, from the properly admitted photographs of Lopez's tattoos and Padilla's testimony.

## V. Effective assistance of counsel

Lopez contends that if his instructional challenges in arguments II and III have been forfeited by a failure to object, request additional instructions, or propose modifications, then he has been denied effective assistance of counsel as guaranteed under the state and federal constitutions. In argument II, Lopez assigned error to the trial court's failure to instruct the jury with regard to involuntary manslaughter as a lesser included offense of murder. In argument III, Lopez asserted that because CALCRIM Nos. 400 and 401 failed to state that an accomplice can be found guilty of a lesser crime than the perpetrator, they allowed the jury to find him guilty of first degree murder without finding that he intended to aid and abet a first degree murder.

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686; see also Cal. Const., art. I, § 15.) It is the defendant's burden to demonstrate that counsel's performance was deficient and that he was prejudiced by counsel's errors. (*Strickland v. Washington, supra*, at p. 694; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) We considered and rejected both challenges on the merits despite counsel's failure to object. Counsel does not render ineffective assistance by failing to make meritless objections. (*People v. Price* (1991) 1 Cal.4th 324, 386-387.) Further, as we found the alleged errors harmless, Lopez has not met his burden to show prejudice.

26

## VI. Gang and firearm enhancements

### A. Unauthorized gang enhancement

Lopez contends that, because he did not personally use a firearm, the trial court was required to strike rather than impose and stay the gang enhancement of section 186.22, subdivision (b)(1)(C). Padilla also contends that the gang enhancement should have been stricken as to him, because the information failed to allege that he personally used or discharged a firearm and there was no such jury finding.[6] Respondent agrees.

The trial court sentenced each defendant to a total term of 50 years to life in prison, comprised of 25 years to life for the murder pursuant to section 190, subdivision (a), plus 25 years to life under section 12022.53, subdivisions (d) and (e)(1). The gang enhancement alleged under section 186.22, subdivision (b)(1)(C), was imposed and stayed pursuant to section 654.

Section 12022.53, subdivision (e)(2), provides: "An enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." The information alleged that a principal personally and intentionally discharged a firearm, but did not allege, and the jury did not find that either defendant personally and intentionally discharged a firearm. Thus, the trial court erred in imposing the gang enhancement, and it must be stricken. (See *People v. Brookfield* (2009) 47 Cal.4th 583, 590, 596-597.)

### B. Stayed firearm enhancements

Padilla contends that the additional firearm enhancements imposed under section 12022.53, subdivisions (b) and (c), were stayed under the incorrect authority. Respondent agrees. The trial court imposed and stayed the 10-year and 20-year enhancements under section 654, but should have stayed the enhancements pursuant to

---

[6] "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.)

section 12022.53, subdivision (f).  (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129-1130.)  We modify the judgment accordingly.

## VII.  Exclusion of child abuse evidence

Padilla contends that the trial court erred in precluding him from testifying about the details of the abuse he had suffered as a child.  When the prosecutor made a relevance objection to the testimony, defense counsel told the court that he intended to elicit testimony regarding the different homes in which Padilla lived and the physical and emotional abuse he suffered until he was 13 years old.  The trial court sustained the objection under Evidence Code section 352 (hereafter also referred to as section 352).  Padilla was limited to testifying generally that he was physically abused by his father and in foster care, and sexually abused by his mother, without detailing the abuse.

Padilla contends that the trial court abused its discretion and that the error deprived him of his right to present a defense, thus violating his fundamental right to a fair trial under the Sixth Amendment to the United States Constitution.  The right to present a defense is a fundamental element of due process.  (*Washington v. Texas* (1967) 388 U.S. 14, 19.)  However, "[w]hile the Constitution . . .  prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.  [Citations.]"  (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327.)  Thus, "'[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.'  [Citation.]"  (*People v. Dement* (2011) 53 Cal.4th 1, 52, quoting *People v. Hall* (1986) 41 Cal.3d 826, 834.)

As Padilla did not make a constitutional claim in the trial court, "he may not argue on appeal that due process required exclusion of the evidence for reasons other than those articulated in his Evidence Code section 352 argument."  (*People v. Partida* (2005) 37 Cal.4th 428, 435.)  However, he "may make a very narrow due process argument on appeal.  He may argue that the asserted error in admitting the evidence over his Evidence

Code section 352 objection had the additional legal consequence of violating due process." (*Ibid.*)

Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues, supra*, 8 Cal.4th at pp. 1124-1125.) It is the appellant's burden to establish an abuse of discretion. (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.)

The trial court found little probative value to the evidence, which appeared to be intended solely to create sympathy. Padilla does not agree with the trial court that the testimony would serve only to elicit an emotional reaction, particularly since the jurors were instructed not to let sympathy influence their decision. He also argues that the risk of sympathy was outweighed by the probative value of the details of the abuse. However, Padilla does not argue, as he did in the trial court, that the details were necessary to the expert's opinion. He contends that the details of the child abuse were necessary to enhance the jury's belief the abuse occurred, and to demonstrate that the abuse was serious enough to cause the level of PTSD that could have had a substantial effect on his actions. Without the details, Padilla argues, "the jury could make no meaningful determination of the extent to which that abuse could have affected his PTSD and caused him to act in unreasonable self-defense."

We do not find Padilla's present reasoning or the details of the abuse anywhere in his offer of proof to the trial court. To establish an abuse of discretion, it must appear that "[t]he substance, purpose, and relevance of the excluded evidence was made known

to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a).) "An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.] To accomplish these purposes an offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued. [Citations.]" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 53.)

In his offer of proof, defense counsel explained that although Padilla had not told Dr. Booker about the abuse, the expert would testify that child abuse could cause PTSD, and then counsel would ask as a hypothetical question whether a person who had been in foster care at a very young age and had been abused by his parents would be likely to exhibit PTSD syndrome and how such facts would affect his opinion. Defense counsel did not explain to the trial court why or even whether Dr. Booker would need the *details* of the abuse to render an opinion. When Dr. Booker testified the next day, counsel asked how an abusive foster care environment, abusive parents, and childhood physical and sexual abuse would affect a person with PTSD. Counsel did not ask him whether he needed details of the childhood abuse to render an opinion, and Dr. Booker gave his opinion without indicating that he would need the details of the abuse.

Thus, Padilla never informed the trial court of the specific reasons why the detailed facts of the childhood abuse were necessary to establish the level or intensity of possible PTSD symptoms. Under these circumstances, Padilla has failed to demonstrate that the trial court's decision was irrational or arbitrary.

Moreover, Padilla has not demonstrated that the exclusion of the details resulted in a miscarriage of justice. Padilla contends this element is determined under the test applied to federal constitutional error, which is reversible unless the respondent demonstrates beyond a reasonable doubt that it did not contribute to the verdict. (See *Chapman, supra*, 386 U.S. at p. 24.) However, Padilla has not yet established error under section 352 as a prerequisite to reaching his constitutional claims. (See *People v. Partida, supra*, 37 Cal.4th at p. 435.) Under section 352, Padilla must demonstrate not

30

only that the ruling was erroneous, but also that exclusion of the details of the childhood abuse resulted in a miscarriage of justice. (See *People v. Rodrigues, supra*, 8 Cal.4th at p. 1124; Evid. Code, §§ 352, 354; Cal. Const., art. VI, § 13.) Thus, it is Padilla who must demonstrate a miscarriage of justice, and he must do so under the standard set forth in *Watson*, *supra*, 46 Cal.2d at p. 836. (*People v. Paniagua* (2012) 209 Cal.App.4th 499, 524.) Under this test, Padilla must demonstrate a reasonable probability that if the court had allowed his testimony regarding the details of the childhood abuse, he would have obtained a more favorable result. (See *Watson, supra*, at p. 836.)

Padilla acknowledges that the evidence of his intent to kill Romero was overwhelming. He also acknowledges that Dr. Booker gave the very opinions he wished to bring out: that childhood abuse would have made Padilla more likely to suffer from PTSD and to experience a greater degree of trauma; and that PTSD can cause a person to react in an overly aggressive manner to a situation that he perceives as life threatening. Padilla nevertheless argues that the details of the abuse could have caused the jury to believe that he was so affected by his childhood trauma that he acted under a belief that he needed to defend himself.

Given the overwhelming evidence to the contrary, we do not agree that the details of Padilla's childhood abuse would have been reasonably likely to cause a rational jury to believe that Padilla was acting in a mistaken belief that Romero was about to attack him. Dr. Booker testified that while PTSD could result in hypervigilance, manifested by a preoccupation with personal or physical safety, exaggerated responses, and sometimes overly aggressive responses to a perceived life threat, he also testified that a person with PTSD such as Padilla would avoid gang warfare situations and dangerous areas. Thus, even if the jury believed that Padilla's PTSD could have been exacerbated by specific abuse, it would not logically follow that rather than taking a nearby bus, he would go to a bus stop in rival gang territory simply because he was tired and preferred the express. Moreover, it is not reasonably probable that knowing the details of the abuse would have caused the jury to believe Padilla's testimony that he ever waited at the bus stop with Romero or that he could have misinterpreted any move by Romero, as eyewitness

31

testimony placed Padilla at a distance of seven or eight feet from the bus stop when he began firing at Romero while Romero raised his hands defensively, and as Padilla himself testified that he did not feel threatened by Romero when he first saw him in enemy territory. This was not a close case, and as Padilla admitted giving "wildly different" version of the events, it is unlikely that the jurors would have believed his trial testimony even if they had known exactly what abuse he had suffered as a child.

We conclude that Padilla has failed to demonstrate either an abuse of discretion or a miscarriage of justice, that there has been no denial of due process or a fair trial, and the *Chapman* test is inapplicable. Nevertheless, as there was no error and no miscarriage of justice, the exclusion of the evidence was harmless beyond a reasonable doubt.

## DISPOSITION

The judgments are modified as follows: the 10-year gang enhancement imposed pursuant to section 186.22, subdivision (b)(1)(C), and stayed pursuant to section 654, is to be stricken from Lopez's judgment and from Padilla's judgment; Padilla's judgment is modified to reflect that the firearm enhancements imposed pursuant to section 12022.53, subdivisions (b) and (c), are stayed pursuant to section 12022.53, subdivision (f), rather than section 654. As modified and in all other respects, the judgments are affirmed. The trial court is directed to prepare amended abstracts of judgment reflecting these modifications, and to forward copies to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:

_____, P. J.
BOREN

_____, J.
ASHMANN-GERST

32